## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

—————————————————————————

|   |   |
|---|---|
| PLASTIC SURGERY ASSOCIATES, S.C., <br> GREEN CHRYSALIS ENTERPRISE, LLC, <br> RENEW SKIN & LASER CENTERS, LLC, <br> ARIZONA ADVANCE AESTHETICS, PLLC <br> and ADVANCED HEALTH WEIGHT LOSS, <br> on behalf of themselves and others <br> similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> CYNOSURE, INC., <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br><br> Civil Action No. 17-11850-DJC |

—————————————————————————

|   |   |
|---|---|
| VITA 4 LIFE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> CYNOSURE, INC., <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br><br><br> Civil Action No. 17-cv-11435-DJC |

—————————————————————————

## MEMORANDUM AND ORDER

CASPER, J.                                                    August 7, 2019

## I.   Introduction

Plaintiffs Plastic Surgery Associates, S.C., Green Chrysalis Enterprise, LLC, Renew Skin

& Laser Centers, LLC, Arizona Advance Aesthetics, PLLC and Advanced Health Weight Loss

(collectively, "Plaintiffs")[1] have filed this putative class action lawsuit against Defendant Cynosure, Inc. ("Cynosure") alleging violations of Mass. Gen. L. c. 93A (Count I), breach of the implied warranty of merchantability (Count II) and unjust enrichment (Count III) in connection with the sale of Cynosure's SculpSure Noninvasive Body Contouring System ("SculpSure").  D. 1.  Plaintiffs have moved for class certification pursuant to Federal Rule of Civil Procedure 23(c)(4).  D. 60 (and D. 110 in No. 17-11435-DJC).  Cynosure has moved for summary judgment on all claims.  D. 55.  For the reasons explained below, the Court DENIES Plaintiffs' motion for class certification, D. 60 (and D. 110 in No. 17-11435-DJC), and ALLOWS Cynosure's motion for summary judgment, D. 55.

## II.      Standard of Review

### A.      <u>Class Certification</u>

A class action may be certified only if "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed R. Civ. P. 23(a); <u>see</u> <u>In re New Motor Vehicles Canadian Export Antitrust Litig.</u>, 522 F.3d 6, 18 (1st Cir. 2008).  "In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." <u>Amchem Prods. v. Windsor</u>, 521 U.S. 591, 614 (1997).  Plaintiffs bear the burden of proving that class certification is warranted. <u>Makuc v. Am. Honda Motor Co., Inc.</u>, 835 F.2d 389, 394 (1st Cir. 1987).

---

[1] Plaintiffs Infinity Spa Orlando, LLC and Vita 4 Life, Inc. were voluntarily dismissed from the case in April 2018.  <u>See</u> 17-cv-11435-DJC, D. 74, 77.

### B.   Summary Judgment

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law."  Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)).  The movant "bears the burden of demonstrating the absence of a genuine issue of material fact."  Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant meets its burden, the non-moving party may not rest on the allegations or denials in her pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but "must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor," Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010).  "As a general rule, that requires the production of evidence that is 'significant[ly] probative.'"  Id. (alteration in original) (quoting Anderson, 477 U.S. at 249).  The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

## III.   Factual Background

The following facts are drawn primarily from Cynosure's statement of undisputed material facts in support of summary judgment, D. 57, Plaintiffs' response and additional statement of facts in opposition, D. 111, Cynosure's response, D. 117, Plaintiffs' proffer of evidence in support of class certification, D. 65, Cynosure's declaration in opposition to class certification, D. 83, and supporting documents.  The facts are undisputed unless otherwise indicated.

Cynosure is a medical device company located in Westford, Massachusetts that markets and distributes SculpSure.  D. 57 ¶ 1; D. 111 at 19 ¶ 1.  SculpSure is a non-invasive (non-surgical) body contouring device intended to reduce fat in specific areas of the body.  D. 65 ¶ 1.  The device works by delivering laser energy to a patient's subcutaneous fat tissue, which raises the temperature of the patient's fat cells and causes those cells to inflame and die.  D. 57 ¶ 2; D. 111 at 2 ¶ 2, see D. 83-31 at 2; D. 93 at 207.  The treatment time for patients is twenty-five minutes. D. 65 ¶¶ 17-18; D. 93 at 207.  Since 2015, Cynosure has sold SculpSure devices to over 1,400 customers.  D. 65 ¶ 20; D. 82 at 11.  The customers are mostly plastics surgeons and medical spas. D. 65 ¶ 9.  One SculpSure device costs approximately $165,000.  D. 65 ¶ 20; see D. 82 at 7.

## A.      SculpSure Development and Sales

Cynosure developed SculpSure for approximately four years, beginning in 2011.  D. 111 at 20 ¶ 5; D. 117 at 22 ¶ 5.  At the time, there were other types of devices in the non-surgical body contouring market, but those devices did not rely on lasers.  D. 111 at 19-20 ¶¶ 2-3; D. 117 at 21-22 ¶¶ 2-3.  Cynosure considered some of the disadvantages of the other types of devices to be that they required multiple sessions, made it difficult to see results, had low success rates and, for some, that they induced "pain at time of treatment."  D. 111 at 21 ¶ 7; D. 117 at 23 ¶ 7.  Cynosure hoped to create a device that would ideally be "[e]asy to use," cause "[m]inimal or no pain," require "[o]ne treatment session . . . [with] no more than 45 minutes per area" and involve "[m]inimal operator interaction."  D. 111 at 21 ¶ 8; D. 117 at 24 ¶ 8.

During the development of SculpSure in 2013, Cynosure's Medical Advisory Board conducted a review of then-available fat reduction devices and advised that the Cynosure device should have "[s]cientific support for minimum [fat] reduction of 20-25%, preferably 40-50%" and that "[n]on-invasive patients will tolerate ZERO pain."  D. 111 at 23 ¶ 12; D. 92 at 124.  In 2014,

Cynosure created a "Product Definition Document" that, under the heading "Tactics," indicated that Cynosure would "[c]reate a unique selling proposition with better product and pricing" than its competitors.  D. 111 at 24 ¶¶ 13, 15; D. 92 at 14.  The selling proposition would include messages that SculpSure would "[a]chieve 2x the results as compared to the leading competitor," in part by "treating 2 patients in just one hour with a procedure that [would not] have to be monitored by nursing staff."  D. 92 at 14.  Cynosure identified one of the key features and benefits of SculpSure as involving "[v]irtually 'no pain' or discomfort during treatment and post-treatment."  D. 111 at 24 ¶ 16; D. 117 at 28 ¶ 16.  Also in 2014, Cynosure engaged Dr. Lawrence Bass to conduct a study aimed at securing FDA clearance for SculpSure.  D. 111 at 25 ¶ 21.  Dr. Bass' staff reported that the treatment "hurt[] like hell" compared to a competitor's product.  Id.; D. 92 at 167.

SculpSure launched in 2015 and has since received FDA clearance for five different indications:  non-invasive fat reduction of the flanks (May 2015), abdomen (July 2015), thighs and back (June 2017) and chin (September 2017).  D. 57 ¶ 3; see D. 56-1; D. 56-2; D. 56-3; D. 56-4.  Cynosure sells SculpSure largely through face-to-face transactions between customers and Cynosure's more than one hundred sales representatives.  D. 93 at 208.  Before purchasing a SculpSure device, prospective customers often communicate with one or more sales representatives through multiple face-to-face meetings, telephone calls, text messages and emails.  See, e.g., D. 83-15 at 4-5; D. 83-16 at 7-8;  D. 93 at 213, 215.  Cynosure also publishes promotional literature and videos about SculpSure and has collaborated with a public relations and marketing company to host events where celebrities and key opinion leaders promote SculpSure.  See D. 66-3 at 14, 19; D. 66-48; D. 66-49.

From 2015 to 2016, the scale by which operators would measure patient feedback during SculpSure treatments changed several times.  D. 65 ¶¶ 44-50.  As of January 2015, Cynosure envisioned that operators would measure a patient's response to SculpSure using a "patient pain" scale (ranging from one to ten), D. 65 ¶ 44, but by September 2015, all references to "pain" and "sensation" had been removed in favor of a "zone score," D. 65 ¶¶ 48-50.  A SculpSure operator's goal is to "maintain a client Zone Score of 4," which is considered the "Fat Destruction Zone." D. 63-5 at 66.  By November 2016, Cynosure had updated the description of Zone Four in its Clinical Reference Guide from "[l]onger peaks for moderate deep warmth and cooling" to the current description of "[p]rickling, pinching, pressure, longer peaks of moderate deep heat and cooling." D. 65 ¶¶ 88, 96.

In February 2016, Cynosure's introduced a multiple-treatment—rather than a one-time treatment—protocol known as "Treat to Complete."  D. 111 at 35 ¶ 47; D. 83-12 at 7.  According to Cynosure, after Cynosure introduced "Treat to Complete," the messaging by various sales representatives about how many treatments were required for SculpSure still varied "throughout the United States," because there were "pockets of areas [where] . . . people [were] better at staying on top of information than others." D. 83-12 at 7.  Cynosure sometimes received feedback about sales representatives "setting false expectations with patients and physicians." D. 65 ¶ 99.  As late as May of 2017, Cynosure received feedback that sales representatives were telling SculpSure customers that they could "set the patient up with the SculpSure and then leave the room for 25 minutes" and noted that "[a]lthough this is possible . . . it is not how [Cynosure] recommend[s] to treat." D. 65 ¶ 101.

### B.     Purchase Agreements

Each Plaintiff purchased a SculpSure device from Cynosure by signing a purchase agreement from Cynosure.  D. 57 ¶ 5; D. 111 at 41 ¶ 69.  These purchase agreements provide, in a paragraph above the signature line, that "by signing below, the Customer . . . is entering into a binding agreement . . . and accepts all of the terms and conditions as stated in this document (including the following page(s))."  D. 57 ¶ 6; D. 111 at 3-4 ¶ 6.  The second page states in capitalized letters that:

> (A)     THE OBLIGATIONS OF CYNOSURE UNDER THIS WARRANTY ARE LIMITED, IN ITS EXCLUSIVE OPTION, TO REPAIR OR REPLACE PARTS AND MATERIALS WHICH PROVE TO BE DEFECTIVE.
>
> (B)     THE FOREGOING WARRANTIES ARE THE SOLE AND EXCLUSIVE WARRANTY OBLIGATIONS OF CYNOSURE, AND THE REMEDY PROVIDED ABOVE IS IN LIEU OF ANY AND ALL OTHER REMEDIES.  THERE ARE NO OTHER AGREEMENTS, GUARANTEES, OR WARRANTIES, ORAL, WRITTEN, EXPRESSED, IMPLIED, OR STATUTORY, INCLUDING, WITHOUT LIMITATION, WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. CYNOSURE SHALL NOT BE LIABLE FOR LOST PROFITS OR ANY INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES DUE TO ANY CAUSE WHATSOEVER EVEN IF ADVISED AS TO THE POSSIBILITY OF SUCH DAMAGES.  THE CUSTOMER AGREES THAT CYNOSURE'S LIABILITY IS SO LIMITED.

D. 57 ¶ 8; D. 111 at 4-5 ¶ 8.  The second page also contains a choice-of-law provision that states that "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts.  The Customer agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston, Massachusetts."  D. 111 at 41 ¶ 71; D. 117 at 65 ¶ 71.

### C.     Plaintiffs

#### 1.     *Plastic Surgery Associates, S.C.*

Plaintiff Plastic Surgery Associates, S.C. ("PSA") provides cosmetic treatments, plastic surgery and skin care to its patients in Wisconsin.  D. 57 ¶ 63; D. 111 at 15 ¶ 63.  Christopher Hussussian, one of the owners of PSA, signed a purchase agreement for SculpSure on behalf of PSA on November 23, 2015.  D. 57 ¶ 65; D. 111 at 15 ¶¶ 65.  Prior to signing the agreement, Hussussian and George Korkos, the founder of PSA, read the agreement, including the warranty limitation section on the second page.  D. 57 ¶ 67; D. 111 at 15 ¶ 67.

In October 2015, Hussussian attended a meeting of the American Society of Plastic Surgeons ("ASPS") in Boston, Massachusetts, where he learned about SculpSure and was told it would provide results "equivalent to [a competitor's product]" and a "comfortable patient."  D. 57 ¶ 68; D. 111 at 15 ¶ 68.  Hussussian was the only member of PSA to attend the ASPS meeting.  D. 57 ¶ 69; D. 111 at 16 ¶ 69.  At the meeting, Hussussian spoke to Cynosure representatives at their booth and observed a demonstration, but did not attend any presentations related to SculpSure.  D. 57 ¶ 70; D. 111 at 16 ¶ 70.

After the ASPS meeting, Hussussian returned to Wisconsin, where he discussed SculpSure with Korkos and they "decided to investigate possibly bringing [the device] into [their] practice."  D. 57 ¶ 71 (alteration in original); D. 111 at 16 ¶ 71.  In November 2015, Hussussian, Korkos and other PSA personnel met with an Illinois-based Cynosure sales representative in Wisconsin, during which the representative displayed before and after photographs and discussed studies that had been done on SculpSure.  D. 57 ¶¶ 72-73; D. 111 at 16 ¶¶ 72-73.  After this in-person meeting, the sales representative had three or four phone conversations, multiple text messages and approximately ten email communications with Hussussian about SculpSure.  D. 57 ¶ 74; D. 111 at

17 ¶ 74. Hussussian testified that he was told SculpSure required only one treatment and was a "hands-free" procedure. D. 65 ¶ 105. Hussussian also communicated with a doctor in New Jersey or New York who owned a SculpSure device about his clinical experiences with the device. D. 57 ¶ 76; D. 111 at 17 ¶ 76. Within PSA, Hussussian was "primarily responsible for the research" about SculpSure. D. 57 ¶ 78; D. 111 at 18 ¶ 78.

Hussussian testified that if he had known Cynosure would change the SculpSure protocol from one treatment to multiple treatments, it would have affected PSA's decision to purchase SculpSure. D. 65 ¶ 106; D. 65-101 at 14. Hussussian also testified that PSA's local reputation was harmed after and by the purchase of the SculpSure device. D. 57 ¶ 79; D. 111 ¶ 79.

### 2. *Green Chrysalis Enterprise LLC (d/b/a The Face Place)*

Plaintiff The Face Place is a medical spa in Hurst, Texas. D. 57 ¶ 49; D. 111 at 12 ¶ 49; D. 65 ¶ 107. Donna Green, its founder and owner, signed a purchase agreement for SculpSure on behalf of The Face Place on February 29, 2016. D. 57 ¶¶ 50-52; D. 111 at 12 ¶¶ 50-52. Green testified that the version of the purchase agreement she signed had only one page and did not include the page with the warranty limitations. D. 56-19 at 11. Green has only the first page in her records. D. 111 at 41 ¶ 72; D. 117 at 65 ¶ 72.

The Face Place became interested in SculpSure when Lance Baird, a Cynosure sales representative based in Arizona, visited The Face Place office in Texas in December 2015. D. 57 ¶¶ 56, 59; D. 111 at 13-14 ¶¶ 56, 59. Green relied upon statements made during two in-person meetings in Texas, one phone call and one email with Baird in deciding to purchase SculpSure and did nothing else to learn about SculpSure before purchasing it. D. 57 ¶¶ 56-57, 60-61; D. 111 at 13-14 ¶¶ 56-57, 60-61. Green testified that she was told SculpSure required only one treatment, would be "painless" or a "warm tingling sensation" and would be "hands-free." D. 65 ¶ 108;

D. 65-103 at 4.  Green also testified that if she had known Cynosure would change the SculpSure protocol from one treatment to multiple treatments, it would have changed The Face Place's decision to purchase SculpSure.  D. 65 ¶ 109.  Finally, Green testified that The Face Place's local reputation was harmed after and by the purchase of the SculpSure device.  D. 57 ¶ 79; D. 111 at 18 ¶ 79.  No personnel from The Face Place went to Massachusetts at any time in connection with the purchase of SculpSure.  D. 57 ¶ 62; D. 111 at 14 ¶ 62.

### 3.  *Renew Skin & Laser Centers, LLC (d/b/a Dermacare)*

Plaintiff Dermacare is a medical spa located in Virginia.  D. 57 ¶ 22; D. 111 at 7 ¶ 22. Leon Garber, its owner, signed a purchase agreement for SculpSure on behalf of Dermacare on December 22, 2015.  D. 57 ¶¶ 23-25; D. 111 at 7-8 ¶¶ 23-25.  Garber does not recall whether he read the contract for SculpSure but believes that, based on his normal practices, he would have read it and wanted to make sure he understood what it said.  D. 57 ¶ 27; D. 111 at 8 ¶ 27.  The version of the purchase agreement that Dermacare possesses only contains the first page.  D. 111 at 42 ¶ 74; D. 117 at 66 ¶ 74.

Garber learned about SculpSure in the fall of 2015 when a colleague in Florida told him about it and subsequently emailed with him about it.  D. 57 ¶¶ 28-29; D. 111 at 8 ¶¶ 28-29.  Before purchasing SculpSure, Garber spoke to a Maryland-based sales representative from Cynosure and had an in-person meeting in Virginia with the same representative and one other who was based out of Washington, D.C.  D. 57 ¶¶ 30-32; D. 111 at 9 ¶¶ 30-32.  Garber was the only person from Dermacare communicating with Cynosure before his company purchased SculpSure and he relied upon the statements of the sales representatives and his Florida colleague in deciding to make the purchase.  D. 57 ¶¶ 33-34; D. 111 at 9 ¶¶ 33-34.  Garber testified that he was told that SculpSure would require only one treatment, be "uncomfortable but not painful" and that the operator could

leave the room after the first five minutes.  D. 65 ¶ 111; D. 65-105 at 10.[2]  He also testified that

Cynosure did not tell him about "Treat to Complete" until about six months after he had purchased

SculpSure.  D. 65 ¶ 111.  No personnel from Dermacare went to Massachusetts at any time in

connection with the SculpSure purchase.  D. 57 ¶ 35; D. 111 at 10 ¶ 35.

#### 4. *Arizona Advanced Aesthetics, PLLC (d/b/a Enhanced Image)*

Plaintiff Enhanced Image is a medical spa located in Arizona.  D. 57 ¶ 10; D. 111 at 5 ¶ 10.

The owner of Enhanced Image is Jennessa Iannitelli.  D. 57 ¶ 11; D. 111 at 5 ¶ 11.  Iannitelli signed

the purchase agreement for SculpSure on behalf of Enhanced Image on January 29, 2016.  D. 57

¶¶ 12-13; D. 111 at 5-6 ¶¶ 12-13.  Prior to signing the purchase agreement, Iannitelli read the

purchase agreement, including the warranty limitation section on the second page.  D. 57 ¶ 14; D.

111 at 6 ¶ 14.

Enhanced Image first learned about SculpSure from Cynosure sales representative Sharon

Knecht near the end of 2015 when Knecht visited its facility in Arizona.  D. 57 ¶ 15; D. 111 at 6

¶ 15.  After the initial in-person meeting, Knecht and Cynosure sales representative Justin

Thompson provided additional information about SculpSure to Iannitelli and Karen Janitell, who

also worked at Enhanced Image, at a luncheon in Glendale, Arizona.  D. 57 ¶ 16; D. 111 at 6 ¶ 16.

After this meeting, Iannitelli had several more in-person meetings with Knecht and Thompson in

Arizona and received follow-up emails.  D. 57 ¶¶ 17-18; D. 111 at 6-7 ¶¶ 17-18.  Iannitelli testified

that the sales representatives told her SculpSure required only one treatment, was "painless" and

"hands free," such that there "would be a very short period of time that [she] would actually be

present in the room" with the patient.  D. 65 ¶ 114.  Iannitelli also testified that Enhanced Image's

---

[2] Plaintiffs allege that Garber testified that he would not have purchased SculpSure if he knew the truth about it, D. 65 ¶ 112, but that is not reflected in the cited deposition testimony.  <u>See</u> D. 66-105 at 8-11.

local reputation was harmed after and by the purchase of the SculpSure device.  D. 57 ¶ 79; D. 111 at 18 ¶ 79.

Knecht and Thompson were based in Arizona.  D. 57 ¶ 19; D. 111 at 7 ¶ 19.  No personnel from Enhanced Image went to Massachusetts at any time in connection with the purchase of SculpSure.  D. 57 ¶ 21; D. 111 at 7 ¶ 21.

     *5.    Advanced Health Weight Loss, S.C. (d/b/a Options Medical)*

Plaintiff Options Medical is a medical spa located in Illinois.  D. 57 ¶ 37; D. 111 at 10 ¶ 37. The founder of Options Medical, Dr. Matthew Walker, signed the purchase agreement for SculpSure on behalf of Options Medical on September 27, 2016.  D. 57 ¶¶ 38-40; D. 111 at 10 ¶¶ 38-40.  Walker read the purchase agreement before he signed it, including the warranty limitation language on the second page, as did the majority owner (Dr. Barton) and minority owner (Dr. Mattingly) of Options Medical.  D. 57 ¶¶ 40-42; D. 111 at 10-11 ¶¶ 40-42.

Prior to purchasing SculpSure, Barton contacted a SculpSure owner in Florida and received information from him about SculpSure.  D. 57 ¶ 43; D. 111 at 11 ¶ 43.  Options Medical personnel then met twice in Illinois with a Cynosure sales representative and communicated with a sales representative over email.  D. 57 ¶¶ 44-45; D. 111 at 11 ¶¶ 44-45.  No personnel from Options Medical went to Massachusetts at any time in connection with the SculpSure purchase.  D. 57 ¶ 48; D. 111 at 12 ¶ 48.

In deciding to purchase SculpSure, Options Medical relied upon statements made by the Cynosure sales representative in Illinois.  D. 57 ¶ 46; D. 111 at 11-12 ¶ 46.  Barton testified that he was informed SculpSure was a one-treatment procedure, not painful and would not require a staff member to be present during the entire treatment.  D. 65 ¶ 117.  Barton also testified that Options Medical would not have purchased SculpSure if it knew that information was incorrect.

D. 65 ¶ 118.  Finally, Barton testified that Options Medical's local reputation was harmed after

and by the purchase of the SculpSure device.  D. 57 ¶ 79; D. 111 at 18 ¶ 79.

## IV.    Procedural History

Plaintiffs instituted the first of two consolidated cases in Suffolk Superior Court on June

16, 2017 and Cynosure removed the case to this Court.  Vita 4 Life v. Cynosure, Inc., No. 17-cv-

11435-DJC (D. Mass. Aug. 3, 2017), D. 1.  Plaintiffs instituted this action on September 27, 2017.

D. 1.  Two related cases that are not putative class actions have also been filed against Cynosure.

See Ederra Plastic Surgery, P.C. v. Cynosure, Inc., No. 19-cv-10164-DJC (D. Mass. 2019); WBM

Med. Assocs., LLC v. Cynosure, Inc., No. 18-cv-11269-DJC (D. Mass. 2018).  Cynosure now has

moved for summary judgment on all claims, D. 55, and Plaintiffs have moved for class certification

and appointment of class counsel, D. 60 (and D. 110 in No. 17-11435-DJC).  The Court heard the

parties on the pending motions on June 20, 2019 and took these matters under advisement.  D. 119.

## V.    Discussion

### A.    Class Certification

Plaintiffs have proposed to certify a partial class under Fed. R. Civ. P. 23(c)(4) for alleged

violations of Mass. Gen. L. c. 93A ("Chapter 93A").  Plaintiffs have proposed the following class

definition for certification as to their claims for violations of Chapter 93A.

> All individuals and entities in the United States who purchased or leased a
> SculpSure Non-Invasive Body Contouring Platform.

D. 60 at 2.[3]

Rule 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained

as a class action with respect to particular issues."  Fed. R. Civ. P. 23(c)(4).  Pursuant to Rule

---

[3] Plaintiffs have not moved for class certification with respect to their other claims for breach of
the implied warranty of merchantability (Count II) or unjust enrichment (Count III).

23(c)(4), Plaintiffs seek to certify four issues related to their Chapter 93A claims.  To prevail on a

claim under Chapter 93A, § 11, Plaintiffs must establish that "[1] a person who is engaged in trade

or business [2] committed an unfair or deceptive trade practice and [3] that the claimant suffered

a loss of money or property as a result."  Bowers v. Baystate Techs., 101 F. Supp. 2d 53, 54 (D.

Mass. 2000) (citing Alan Corp. v. Int'l Surplus Lines Ins. Co., 823 F. Supp. 33, 43 (D. Mass.

1993)).  Accordingly, Plaintiffs seek to resolve the first two elements of their Chapter 93A claim

by adjudicating the following questions on a classwide basis:

1. Was Cynosure engaged in "trade or business" when it sold SculpSure to
   Plaintiffs and the putative class?

2. Did Cynosure engage in a deceptive act or practice by representing SculpSure
   as a one-time treatment?

3. Did Cynosure engage in a deceptive act or practice by representing SculpSure
   as "painless" or "pain-free" or "comfortable"?

4. Did Cynosure engage in a deceptive act or practice by representing SculpSure
   as a "hands-free" treatment that permitted the operator to leave the room during
   the procedure?

D. 64 at 25.

Cynosure argues that the proposed class must fail because certifying an issue class will not

"fairly and efficiently advance the resolution of class members' claims." Gates v. Rohm & Haas

Co., 655 F.3d 255, 273 (3d Cir. 2011); see Rahman v. Mott's LLP, 693 F. App'x 578, 579 (9th

Cir. 2017) (noting that "[c]ertification of an issues class under Rule 23(c)(4) is appropriate only if

it materially advances the disposition of the litigation as a whole") (citations and internal quotation

marks omitted).  As Cynosure posits, even if a factfinder concluded that the answer to each of

Plaintiffs' questions was "yes," those conclusions would not advance the litigation because the

factfinder would still need to evaluate the entirety of each sales transaction to determine the

customer's baseline knowledge about SculpSure and their interpretations of the representations

made by the Cynosure sales representatives.  D. 82 at 8.  Plaintiffs, on the other hand, contend that their proposed issues are suitable for classwide resolution because they require evidence of only Cynosure's conduct and a trial on these issues would be the same in every case.  D. 64 at 7.

The Court agrees with Cynosure.  Even if each of the issues were resolved in Plaintiffs' favor on a classwide basis (including the first proposed issue of whether Cynosure was engaged in "trade or business" when it sold SculpSure),[4] plaintiffs would still be required to show both factual and proximate cause, Small Justice LLC v. Xcentric Ventures LLC, 873 F.3d 313, 325 (1st Cir. 2017), and that showing would require individualized proof, see In re Celexa & Lexapro Mktg. & Sales Practice Litig., 325 F.R.D. 529, 538 (D. Mass. 2017) (holding that the question of whether physicians and putative class members had been exposed to deceptive marketing needed to be "examined on an individual basis" and denying certification of an issue class); Markarian v. Conn. Mut. Life. Ins. Co., 202 F.R.D. 60, 69 (D. Mass. 2001) (noting that the question of causation under Chapter 93A "must be decided with regard to each purchaser in the context of the particular information that he or she received").  During the June 20, 2019 motion hearing, Plaintiffs estimate that approximately 300-400 individualized trials would be necessary after the resolution of their proposed classwide issues to establish such proof as to causation and damages.  Accordingly, the Court concludes that the proposed issue class will not materially advance the litigation or promote judicial economy.

Even assuming *arguendo* that any of the proposed issues could materially advance the litigation, however, the class fails because Plaintiffs have not shown commonality, typicality and

---

[4] The Court agrees with Plaintiffs that the question of whether Cynosure was engaged in "trade or business" when it sold SculpSure can be proven by common evidence, see D. 64 at 28-29, however the resolution of this singular question on a classwide basis would not materially advance the litigation given the need for individualized determination regarding other issues like causation as discussed herein.

adequacy under Rule 23(a) and predominance under Rule 23(c)(4), as explained in more detail below.

### 1.    Ascertainability

As a preliminary matter under Rule 23, the Court must determine "whether the scope of the class . . . is appropriate, *i.e.*, whether it is administratively feasible." Kent v. SunAmerica Life Ins. Co., 190 F.R.D. 271, 278 (D. Mass. 2000) (citing 7C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1760, 581 (2d ed. 1972)).   A class must be determinable by "stable and objective factors" at the outset of a case.   Id.   Not every class member must be identified, but the class must be sufficiently ascertainable to permit a court to "decide and declare who will receive notice, who will share in any recovery, and who will be bound by the judgment." Id. (citing Crosby v. Soc. Sec. Admin. of the U.S., 796 F.2d 576, 580 (1st Cir. 1986)).   The definition for the proposed class identifies members by their purchase of a SculpSure device. Plaintiffs have submitted a spreadsheet listing all SculpSure purchasers, D. 66-1 at 82-122, and Cynosure does not dispute its accuracy or authenticity.   Because each potential member of the class appears to be ascertainable based on this evidence, Plaintiffs have satisfied this initial burden.

### 2.    Rule 23(a) Requirements

#### a)    Numerosity

Under Rule 23(a), the Court must first determine whether "the class is so numerous that joinder of all members is impracticable."   Fed. R. Civ. P. 23(a)(1).   "No minimum number of plaintiffs is required . . . but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."   García-Rubiera v. Calderón, 570 F.3d 443, 460 (1st Cir. 2009) (quoting Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001)); accord In re Relafen Antitrust Litig., 218 F.R.D. 337, 342 (D. Mass. 2003).   Plaintiffs

contend they have met their burden with respect to numerosity because it is undisputed that the proposed class includes approximately 1,400 purchasers of SculpSure.  D. 64 at 6; D. 82 at 16. Cynosure does not dispute numerosity.  Plaintiffs have, therefore, satisfied their burden of showing numerosity.

b)      <u>Commonality</u>

Next, the Court must determine if "there are questions of law or fact common" to the proposed class.  Fed. R. Civ. P. 23(a)(2).  Commonality is satisfied where the claims at issue depend upon a "common contention . . . of such a nature that it is capable of classwide resolution— which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  <u>Wal–Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338, 350 (2011).

Plaintiffs assert that the proposed class shares the common questions of whether the representations characterizing SculpSure as a one-time treatment that is painless and hands-free amount to a deceptive act under Chapter 93A.  D. 64 at 26.  Plaintiffs rely upon <u>Aspinall v. Philip Morris Cos.</u>, 442 Mass. 381 (2004), for the proposition that "[w]hether conduct is deceptive is initially a question of fact, to be answered on an objective basis and not by [a] subjective measure." <u>Id.</u> at 394.  In <u>Aspinall</u>, however, the court certified a class of consumers who purchased cigarettes with the same misleading statements about the "light" nature of those cigarettes on the boxes.  <u>Id.</u> at 385-86.  In contrast, here, there is a threshold question as to what representations Cynosure made to each customer because messaging by sales representatives as Cynosure updated its protocols for SculpSure varied "throughout the United States," D. 83-12 at 7, and some customers spoke to more than one representative.  As the Court has previously noted, "questions of injury and causation are not amenable to common resolution for [a] proposed class" under Chapter 93A "where the record raises individualized questions of proof."  <u>Pagliaroni v. Mastic Home Exteriors,</u>

17

<u>Inc.</u>, No. 12-10164-DJC, 2015 WL 5568624, at *12 (D. Mass. Sept. 22, 2015) (denying class certification); <u>see</u> <u>Kent</u>, 190 F.R.D. at 279-80 (concluding plaintiffs had not "clear[ed] the hurdle[] of commonality" where the alleged injury under Chapter 93A was based on varying oral representations by defendant's salespeople).

Plaintiffs' attempts to show commonality through their expert, Dr. Anna Bar, D. 64 at 19-20, are also unavailing because Bar opines on the importance of a one-time, painless and hands-off treatment to prospective customers, but does not address the representations made to each plaintiff by Cynosure.  Similarly, Plaintiffs' expert, Dr. Nathaniel Fried, posits that SculpSure cannot be successful in a single treatment and is not painless, <u>see</u> D. 64 at 19, but he does not know what representations Cynosure made about these aspects of SculpSure to individual customers. Finally, Plaintiffs cite to promotional materials describing SculpSure in an allegedly deceptive way as supporting commonality, <u>see</u> D. 64 at 13-15, but they do not present evidence showing which, if any, Plaintiffs or proposed class members received these materials.  Plaintiffs, therefore, have failed to meet their burden in demonstrating commonality.

c)     <u>Typicality</u>

Plaintiffs must also show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "The representative plaintiff satisfies the typicality requirement when its injuries arise from the same events or course of conduct as do the injuries of the class and when plaintiff's claims and those of the class are based on the same legal theory."  <u>In re Credit Suisse–AOL Sec. Litig.</u>, 253 F.R.D. 17, 23 (D. Mass. 2008) (citation omitted).

The Court concludes that the typicality requirement has not been satisfied as to the proposed class because the circumstances that led each Plaintiff to purchase SculpSure varied.  For example, Hussussian of PSA observed a demonstration of SculpSure at the ASPS meeting in

18

Boston, met with Cynosure representatives and spoke to another doctor who had purchased SculpSure, while Green of The Face Place relied only upon statements made to her by a Cynosure sales representative.  See Markarian, 202 F.R.D. at 65, 69 (holding that typicality had not been satisfied in a Chapter 93A putative class action where information "provided to members of the putative class [was] not uniform, oral representations were often involved, and some prospective purchasers, like [the named plaintiff], had independent sources of advice").

Furthermore, although the class period spans four years, all Plaintiffs purchased their devices in 2016 or earlier.  The timing is significant because Cynosure launched the Treat to Complete protocol in February 2016—before many of the putative class members purchased SculpSure and before two of the Plaintiffs made their purchases.  And while Cynosure sales representatives in some parts of the United States continued to represent SculpSure as a one-time treatment after February 2016, others did not.  See D. 65 ¶¶ 91-92; D. 63-86 at 2.  Cynosure's instructions for measuring pain with SculpSure also evolved during 2016.  For example, as Plaintiffs point out, Cynosure updated the description of Zone Four in the Clinical Reference Guide to include "prickling, pinching, [and] pressure" in November 2016.  Whether prospective customers received the Clinical Reference Guide is unclear from the record, but to the extent they did or that sales representatives were instructed to update their pitches to be consistent with the Guide, customers who purchased SculpSure before and after November 2016 would have had access to different representations about the level of pain anticipated for patients undergoing SculpSure treatments.  In sum, the Court concludes that "no 'typical' case is presented by these plaintiffs," such that class certification would be appropriate.  Kent, 190 F.R.D. at 279.

d)      Adequacy

Pursuant to Rule 23(a)(4), the Court considers whether "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This factor requires Plaintiffs to establish an absence of potential conflict and an assurance of vigorous prosecution. See Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985). The class representatives must be part of the class, possess the same interest and suffer the same injury as class members. See Amchem, 521 U.S. at 625-26. "[P]erfect symmetry of interest is not required and not every discrepancy among the interests of class members renders a putative class action untenable." Matamoros v. Starbucks Corp., 699 F.3d 129, 138 (1st Cir. 2012). Rather, the inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent," Amchem, 521 U.S. at 625, and focuses on conflicts that are "fundamental to the suit and that go to the heart of the litigation," Matamoros, 699 F.3d at 138 (quoting 1 William B. Rubenstein, Newberg on Class Actions § 3:58 (5th ed. 2012)).

The Court accepts as adequate the qualification and experience of Plaintiffs' counsel. See D. 64 at 27-28. Inconsistencies between the alleged representations made to each class member, however, go to the heart of the litigation. In other words, as explained under the rubric of the "related element[] of typicality," Markarian, 202 F.R.D. at 65, Plaintiffs have failed to present evidence that their interests are representative of those of the rest of the proposed class. Accordingly, and for the reasons discussed above pertaining to commonality and typicality, the Court concludes that Plaintiffs have failed to demonstrate adequacy.

3.      *Rule 23(b)(3) and Rule 23(c)(4)*

Rule 23(b)(3) requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is

superior to other available methods for fairly and effectively adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  The First Circuit has not yet ruled on whether the predominance requirement under Rule 23(c)(4) applies to the class as a whole, as it does under Rule 23(b)(3), or only as to the specific issues being certified.  See In re Prograf Antitrust Litig., No. 1:11-md-02242-RWZ, 2014 WL 4745954, at *2 (D. Mass. June 10, 2014).  Other circuit courts have taken differing views.  Compare Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir. 1996) (noting that "[e]ven if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues"), and In re Nassau Cty. Strip Search Cases, 461 F.3d 219, 226 (2d Cir. 2006) (same), with Castano v. Am. Tobacco Co., 84 F.3d 734, 745 n.21 (5th Cir. 1996) (explaining that "[t]he proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial" (citation omitted)).

Even assuming, as the court did in Prograf, 2014 WL 4745954, at *3, that common questions need only predominate as to the specific issues being certified, the Court concludes that Plaintiffs have failed to demonstrate predominance as to these issues.  As discussed above, as to each of Plaintiffs' proposed issues for certification (other than the first question as to whether Cynosure was engaged in "trade or business" when it sold SculpSure) lies the threshold question of whether Cynosure ever made such a representation to the putative class member.  For this reason, "most courts hold that certification is not appropriate when the plaintiffs' claims are based on oral representations, which, by their nature, tend to be particularized." Rothwell v. Chubb Life

Ins. Co. of Am., 191 F.R.D. 25, 30 (D.N.H. 1998) (finding that predominance had not been satisfied and collecting cases); see Kent, 190 F.R.D. at 280 (noting that a "finding of a predominance of common questions . . . [is] hard to find in such a grab-bag of individualized factual findings" and denying class certification).[5]

As to second prong of Rule 23(b)(3), the Court concludes that Plaintiffs have failed to demonstrate the superiority of a class action lawsuit as a method of resolving this dispute.  The "policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." Amchem, 521 U.S. at 617 (quoting Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997)).  This policy concern is not implicated here, where the alleged injury for each plaintiff exceeds $150,000.  See, e.g., Lyon v. Caterpillar, Inc., 194 F.R.D. 206, 222 (E.D. Pa. 2000) (denying class certification where individual claims exceeded $100,000 because such claims "would certainly be large enough to make individual suits feasible"); Stoudt v. E.F. Hutton & Co., Inc., 121 F.R.D. 36, 38 (S.D.N.Y. 1988) (explaining that, where the claims exceeded $60,000, "each proposed class member therefore possesse[d] the ability to assert an individual claim [and] the goal of obtaining redress [could] be accomplished without the use of the class action device").  The fact that individual class members have sued separately in related cases pending before the

---

[5] The Court is in receipt of Cynosure's notice of supplemental authority, D. 118, regarding predominance and "the difficulties of demonstrating causation on a class-wide basis" as addressed by the court in In re TJX Cos. Retail Sec. Breach Litig., 246 F.R.D. 389, 398 (D. Mass. 2007) and concludes that it is consistent with the Court's opinion in this matter.

The Court is also in receipt of Plaintiffs' notice of supplemental authority, D. 130, regarding the certification of a liability-only class under Rule 23(c)(4) in Slocum v. Int'l Paper Co., No. 16-12563, 2019 WL 2192099, at *1 (E.D. La. May 21, 2019).  In Slocum, however, the cause of the plaintiffs' injuries was "limited to a single incident" (namely, an explosion), caused by a "single ruptured evaporator tank," whereas the harm here was allegedly caused by varying oral representations around the country. Id. at *4-5.  Slocum, therefore, is inapposite.

Court supports the proposition that class certification is not necessary to ensure the vindication of plaintiffs' claims. In sum, the Court concludes that Plaintiffs have failed to meet their burden under Rule 23(b), even reading the requirements of the rule narrowly to account for the proposal of an issue class.[6]

### B.   Summary Judgment

The Court now turns to Cynosure's motion for summary judgment on all of Plaintiffs' claims. D. 55.

### 1.   Chapter 93A

Cynosure first argues that it is entitled to summary judgment on Plaintiffs' claim under Chapter 93A because the alleged violations did not occur "primarily and substantially within the Commonwealth [of Massachusetts]." Fishman Transducers, Inc. v. Paul, 684 F.3d 187, 197 (1st Cir. 2012) (alteration in original) (quoting Mass. Gen. L. c. 93A, § 11). To determine whether alleged misconduct occurred primarily and substantially within Massachusetts, as is required under Section 11 of Chapter 93A, courts identify the "center of gravity of the circumstances" alleged to violate the statute. Kuwaiti Danish Comput. Co. v. Dig. Equip. Corp., 438 Mass. 459, 473 (2003). The "center of gravity" determination "is not a determination that can be reduced to any precise formula." Pine Polly, Inc. v. Integrated Packaging Films IPF, Inc., No. 13-11302-NMG, 2014 WL 1203106, at *7 (D. Mass. Mar. 19, 2014) (quoting Kuwaiti Danish, 438 Mass. at 472).

Plaintiffs contend that Cynosure cannot disclaim liability under Chapter 93A because Cynosure selected Massachusetts law in the choice of law provision contained in each of the Plaintiffs' contracts. D. 90 at 13. The First Circuit has explained that "[u]nder Massachusetts law,

---

[6] Because the Court denies the motion for class certification, appointment of Hagens Berman Sobol Shapiro LLP as class counsel, as requested by Plaintiffs, is not necessary. See D. 60 at 3.

the burden is upon the defendant to disprove the 'primarily and substantially' condition [of Chapter 93A], making it effectively an affirmative defense." Amcel Corp. v Int'l Exec. Sales, Inc., 170 F.3d 32, 35 (1st Cir. 1999). Accordingly, Plaintiffs argue, there is no jurisdictional prerequisite under Chapter 93A and Cynosure has waived the potential defense by its inclusion of the choice of law provision in the contract. Plaintiffs, however, cite no case for the proposition that Cynosure, through its conduct, has waived either the affirmative defense or the statutory geographical requirement.

Moreover, the Court concludes that the choice of law provision in the SculpSure purchase agreements does not apply to Plaintiffs' claims under Chapter 93A, § 11 because those claims sound in tort, rather than in contract, and therefore fall outside the provision's scope. In Ne. Data Sys., Inc. v. McDonnell Douglas Comput. Sys., Co., 986 F.2d 607, 609 (1st Cir. 1993), the First Circuit reached a similar conclusion when considering the following contractual choice of law provision: "[t]his Agreement and the rights and obligations of the parties hereto shall be governed by and construed in accordance with the laws of California." Id. There, the court held that the plaintiff's "embroidered 'breach of contract claims'" under Chapter 93A that included "bad motive" allegations fell within the scope of the choice of law provision but that the plaintiff's claim of "deceit," which constituted a fraud claim, fell outside its scope. Id. at 610-11. The court explained that because the fraud claim "concern[ed] the validity of the formation of the contract, it [could not] be categorized as involving the rights or obligations arising under the contract." Id. at 611 (emphasis in original); see Vertex Surgical, Inc. v. Paradigm Biodevices, Inc., 390 F. App'x 1, 2-3 (1st Cir. 2010) (holding that choice of law provision stating that Massachusetts law would "exclusively . . . govern all terms of this Agreement" applied to the contract claim but not to the Georgia statutory claim (alteration in original)). Here, as with the fraud claim in Ne. Data Sys.,

Plaintiffs' Chapter 93A claim is that Cynosure made "several uniform material representations" about SculpSure as "part of an aggressive campaign to induce Plaintiffs and the Class to purchase" the device—allegations that are rooted in tort.  D. 1 ¶ 2; see Kitner v. CTW Transp., Inc., 53 Mass. App. Ct. 741, 747 (2002) (concluding that plaintiff's Chapter 93A claim for negligent misrepresentation sounded in tort and, therefore, fell outside the scope of the parties' choice of law provision); RESTATEMENT (SECOND) OF TORTS § 525 (1977) (noting that "[o]ne who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act . . . is subject to liability to the other in deceit for pecuniary loss caused to him by justifiable reliance upon the misrepresentation").  The case cited by Plaintiffs that involves misrepresentation is not analogous to this matter because there the choice of law provision was not limited to contractual disputes.  See Schlesinger v. Superior Court, No. B224880, 2010 WL 3398844, at *2, 7 (Cal. App. Ct. Aug. 31, 2010) (applying choice of law provision that stated "[i]f you have a dispute and your dispute involves an event (or a ticket for an event) that is located in the United States, then the dispute will be governed by the laws of California" to out-of-state plaintiff's claim for misrepresentation).  Accordingly, the Court concludes that Plaintiffs' Chapter 93A claims are not governed by the choice of law provision.[7]

Plaintiffs alternatively contend that even if Cynosure did not waive its affirmative defense to the "primarily and substantially" condition of Chapter 93A through the choice of law provision, Chapter 93A still applies because the "totality of the deception" occurred in Massachusetts.  D. 90 at 17.  Plaintiffs point to the following facts in support of their argument:  Cynosure developed, designed and manufactured SculpSure in Massachusetts, created misleading marketing materials

---

[7] Because the Court holds that the choice of law provision does not apply to Plaintiffs' claims under Chapter 93A, the Court need not address Cynosure's argument that the parties cannot expand the geographic scope of the statute by contract.  See D. 100 at 9-10.

in Massachusetts, hired some third-party companies in Massachusetts to develop a business plan and disseminated deceptive messaging and approved deceptive email blasts and marketing from Massachusetts.

The Court, however, disagrees with Plaintiffs' contention. First, Plaintiffs have not provided evidence showing that Cynosure's marketing materials or email blasts reached Plaintiffs. Thus, the creation of any such materials in Massachusetts does not aid Plaintiffs' position here. Second, it is undisputed that each Plaintiff is located outside of Massachusetts, conducts their business outside Massachusetts, executed its purchase agreement outside Massachusetts and met with Cynosure sales representatives, who were not based in Massachusetts, outside of Massachusetts. Further, four of the five Plaintiffs testified that their local reputation was harmed as a result of using SculpSure and that they never travelled to Massachusetts in connection with SculpSure. As for the one Plaintiff who did travel to Massachusetts (PSA), this singular visit was followed by the subsequent in-person meeting, three or four phone conversations, multiple text messages and approximately ten email communications with a Cynosure sales representative that occurred in Wisconsin.[8] Finally, Plaintiffs have not distinguish persuasively the binding precedent that compels the conclusion that the "center of gravity" in this case falls outside of Massachusetts.

Most recently, in Fishman Transducers, the First Circuit considered a Chapter 93A claim by Fishman, a Massachusetts-based manufacturer of guitar "pickups" (amplifiers), that alleged that a defendant retailer had sold 70,000 guitars by falsely representing that they contained Fishman pickups. Fishman Transducers, 684 F.3d at 189. Fishman did not sell guitars directly to

---

[8] Hussussian also testified that at the ASPS meeting in Massachusetts, he was told SculpSure would be "equivalent to [a competitor's product]" and provide a "comfortable patient," whereas the three alleged misrepresentations upon which Plaintiffs rely in the complaint were that SculpSure would be hands-free, painless and require only a one-time treatment.

consumers but rather supplied pickups to other guitar makers who competed with the defendant. Id. at 194. Fishman, therefore, had to prove damages by showing that the defendant's misconduct diverted sales from nation-wide outlets who purchased guitars from guitar makers whom Fishman supplied. Id. Fishman conceded that no more than a "small portion" of the defendant's sales occurred within Massachusetts. Id. at 197. In affirming the district court's dismissal of Fishman's Chapter 93A claim, the court held that although Fishman was arguably deprived of sales due to the defendant's conduct, "the direct impact of the deception—to the extent it occurred—was on customers all over the country, few of whom were in Massachusetts." Id. The court went on to state that "[w]here wrongdoing is not focused on Massachusetts but has relevant and substantial impact across the country, the 'primarily' requirement of [Chapter 93A] section 11 cannot be satisfied." Id.

Similarly, in Sonoran Scanners, Inc. v. PerkinElmer, Inc., 585 F.3d 535, 545-46 (1st Cir. 2009), the First Circuit applied the "center of gravity" test to an Arizona-based plaintiff's claim that a Massachusetts-based defendant had, in relevant part, "misrepresent[ed] its intention to 'develop a strong marketing and sales program'" for plaintiff's business, in violation of Chapter 93A, § 11. Id. (citing Kuwaiti Danish, 483 Mass. at 473). The First Circuit affirmed summary judgment for the defendant despite being based in Massachusetts, because the plaintiff "received and acted upon" the defendant's allegedly deceptive conduct in Arizona and the plaintiff's "losses were incurred in Arizona." Id. at 546. The court in Sonoran relied heavily upon Bushkin Assocs., Inc. v. Raytheon Co., in which the Supreme Judicial Court concluded that the "center of gravity" lay outside Massachusetts, despite the defendant's allegedly deceptive statements having been transmitted from there via telephone to New York. Id. (citing Bushkin Assocs., Inc. v. Raytheon

Co., 393 Mass. 622, 638 (1985)).[9]  The holding in Bushkin turned on the fact that the plaintiff had "received and acted on" the defendant's phone calls in New York and that "any loss was incurred in New York."  Bushkin, 393 Mass. at 638; see Uncle Henry's, 399 F.3d at 45 (affirming summary judgment for defendant on plaintiff's Chapter 93A claim where the judge had found that "'the alleged misrepresentations were received primarily in Maine, where their impact primarily was felt'"); Shimizu Corp v. Dow Roofing Sys., LLC, No. 11-30085-DPW, 2013 WL 5513035, at *17 (D. Mass. Sept. 27, 2013) (granting summary judgment for defendant on plaintiff's Chapter 93A claim where the "only contact with Massachusetts" was that defendant was based there, plaintiff "received and relied on" defendant's representations outside of Massachusetts and "the injury occurred outside Massachusetts").

Here, as in Sonoran Scanners, the allegedly deceptive statements upon which Plaintiffs attest they relied occurred outside Massachusetts.  And unlike in Fishman Transducers, here, not even a "small portion" of Plaintiffs are located in Massachusetts.  The Court, therefore, concludes that Cynosure's alleged misconduct did not occur "primarily and substantially" with Massachusetts and grants summary judgment to Cynosure on Plaintiff's Chapter 93A claim (Count I).

### 2.    Breach of the Implied Warranty of Merchantability

Under Massachusetts law, a seller impliedly warrants that a product is "fit for the ordinary purposes for which such goods are used."  Mass. Gen. L. c. 106, § 2-314(2)(c).  To disclaim the implied warranty of merchantability, a seller must "mention merchantability and in case of a

---

[9] In Uncle Henry's, Inc. v. Plaut Consulting Co., 399 F.3d 33, 45 (1st Cir. 2005), the First Circuit construed the Supreme Judicial Court's "center of gravity" test from Kuwaiti Danish and explicitly noted that the test did not overrule or supersede Chapter 93A's "situs requirement" as articulated in Bushkin.  Id. (citing Kuwaiti Danish, 483 Mass. at 473).

writing must be conspicuous." Id. § 2-316(2). "Conspicuous" terms include ones that are "larger

type than the surrounding text," "contrasting type, font or color to the surrounding text" and "set

off from surrounding text . . . by symbols or other marks." Id. § 1-201(b)(10)(A)-(B). "Whether

a term is 'conspicuous' or not is a decision for the [C]ourt." Id. § 1-201(b)(10).

Cynosure argues, and Plaintiffs do not dispute, that the disclaimer of warranty both

mentions merchantability and was conspicuous. The Court agrees, concluding that the text of the

disclaimer is stated in capital letters and set apart in a separate paragraph, and includes the words

"warranty of merchantability." See Theos & Sons, Inc. v. Mack Trucks, Inc., 431 Mass. 736, 738

n.3, 739-40 (2000) (upholding similar disclaimer written in capital letters because it was

conspicuous and referred to the implied warranty of merchantability). Further contributing to the

disclaimer's conspicuous nature is that the first page of the purchase agreement alerts the buyer to

further terms and conditions, stating in a paragraph above the signature line that "[b]y signing

below, the Customer . . . (ii) is entering into a binding agreement . . . and accepts all of the terms

and conditions as stated in this document (including the following page(s))." D. 57 ¶ 6; D. 111 at

4 ¶ 6; see Logan Equip. Corp. v. Simon Aerials, Inc., 736 F. Supp. 1188, 1197 (D. Mass. 1990)

(ruling that a disclaimer in "small, but legible print" on back of agreement was conspicuous, in

part because of a notice "in readable boldface on its front that the order was subject to the terms

and conditions printed on its reverse").

Plaintiffs do, however, contest that the purchase agreements with Cynosure were validly

formed. Plaintiffs have not conceded the validity of their contracts with Cynosure solely because

they argued the existence of a valid choice of law provision in support of their opposition to

summary judgment on the Chapter 93A claim. See Aetna Cas. Sur. Co. v. P & B Autobody, 43

F.3d 1546, 1555 (1st Cir. 1994) (explaining that "both plaintiffs and defendants in a civil case may

be allowed to maintain alternative contentions at least until evidence is closed"); accord Depianti v. Jan-Pro Franchising Int'l, Inc., 39 F. Supp. 3d 112, 143 (D. Mass. 2014).  As to Plaintiffs PSA, Enhanced Image and Options Medical, however, there is no evidence supporting Plaintiffs' claim about the invalidity of the contracts.  It is undisputed that each of these Plaintiffs signed a contract with Cynosure for the purchase of SculpSure and that their representatives read the entire contract, including the warranty provision, prior to signing.  Given that testimony, the fact that Iannitelli from Enhanced Image testified that the purchase agreement she possesses does not contain the second page does not create a genuine issue of material fact as to the validity of the contract and warranty disclaimer.

The issue of the validity of the contracts for Dermacare and The Face Place merits further discussion.  Neither Garber from Dermacare nor Green from The Face Place testified to having read the warranty disclaimer, and Green testified that she only received the first page of the contract.  Green and Garber also testified that the version of the purchase agreement they have in their possession only contains the first page.  On the other hand, Plaintiffs admitted, in response to Cynosure's statement of undisputed material facts, that "[t]he second page of the purchase agreements entered into by the respective [N]amed Plaintiffs" contained language about the waiver of the implied warranty.  D. 57 ¶ 8; D. 111 at 4-5 ¶ 8.  They also affirmatively pleaded and relied upon the choice of law provision contained in the second page of the Dermacare and The Face Place contracts in support of their arguments under Chapter 93A.[10]  See D. 1 ¶¶ 13-14, D. 90 at

---

[10] Although Plaintiffs' reliance upon the choice of law provision does not automatically preclude Plaintiffs' argument that Dermacare and The Face Place did not receive the second page, as Cynosure contends it should, this argument contradicts the pleadings and record here regarding such receipt.

12.  Cynosure has also produced two-page versions of the purchase agreements with Dermacare and The Face Place that are signed by each entity on the first page.  D. 56-6; D. 56-8.

In <u>Onebeacon Am. Ins. Co. v. ADT Sec. Services, Inc.</u>, a dispute arose about a contract that, like the purchase agreements in question here, stated above the signature line that there was an additional "attachment which contains important terms and conditions for this contract." <u>Onebeacon Am. Ins. Co. v. ADT Sec. Services, Inc.</u>, No. 07-11464-DPW, 2008 WL 2484862, at *3 (D. Mass. June 13, 2008).  Accordingly, the court found as a matter of law that the terms of the attachment "would be incorporated into the [] Contract regardless even of whether [the plaintiff] actually received the second page."  <u>Id.</u>  The court reasoned that even "[a]ssuming no such attachment was included, a reasonable person should have asked to see the attachment with the terms and conditions prior to executing and returning the signature page."  <u>Id.</u> (granting summary judgment for defendant).  Relatedly, in <u>Sarnafil, Inc. v. Peerless Ins. Co.</u>, 418 Mass. 295, 306-07 (1994), the Supreme Judicial Court held that where the agent of a defendant insurance company incorrectly represented the terms of the defendant's policy to plaintiff, it was "unreasonable" for the plaintiff to rely on that representation rather than reading the written policy, which was only two or three pages long and contrary to the agent's representation.  <u>Id.</u>  The court further explained that "in such circumstances, a business entity such as [plaintiff] should read [the] policies rather than rely on representations by an agent."  <u>Id.</u> at 307 (citation omitted) (affirming grant of summary judgment on the related counts to defendant).[11]

---

[11] <u>See also</u> <u>Sasso v. Travel Dynamics</u>, 844 F. Supp. 68, 70-71 (D. Mass. 1994) (holding that the plaintiff's "inability to recollect whether or not they received the entire Contract [was] not significantly probative to create a genuine issue of material fact," particularly in light of defendant's affidavit attesting that the entire contract was mailed to and signed for by plaintiff, and granting summary judgment for defendant (citing <u>Lousararian v. Royal Caribbean Corp.</u>, 951 F.2d 7, 9-10 (1st Cir. 1991)); <u>Logan & Kanawha Coal Co., LLC v. Detherage Coal Sales, LLC</u>, 514 F. App'x 365, 368-69 (4th Cir. 2013) (concluding that "the party challenging incorporation

Dermacare and The Face Place may well have received both pages of the contract, given their admission about the second page and their reliance upon the choice of law language that appears on the second page.  Nevertheless, even if they did not receive the second page, the Court concludes that, consistent with Onebeacon and Sarnafil, Dermacare and The Face Place are sophisticated business entities that received and signed at least the first page of a contract expressly incorporating the terms of the second page and who, even if they were not given the second page, should reasonably have been expected to ask to see the second page before binding themselves to its terms for a purchase that exceeded $150,000.  The Court therefore concludes that the contracts—including the second page—are valid and that Cynosure successfully disclaimed the implied warranty of merchantability.

   3.    *Unjust Enrichment*

Massachusetts law provides an equitable remedy where there has been "unjust enrichment of one party and unjust detriment to the other party."  Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 234 n.7 (1st Cir. 2005) (quoting Bushkin Assocs., Inc. v. Raytheon Co., 906 F.2d 11, 15 (1st Cir. 1990)).  However, "Massachusetts law does not allow litigants to override an express contract by arguing unjust enrichment."  Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 130 (1st Cir. 2006); see Mass. Eye & Ear, 412 F.3d at 234 (noting that unjust enrichment serves only as an "equitable stopgap for occasional inadequacies in contractual remedies at law").  Here, the parties formed valid contracts, even as the Court has

---

need not have actually received the incorporated terms in order to be bound by them," especially where, as here, it is a "sophisticated business entit[y]," and where the contract "made clear reference to . . . the terms and conditions on the following pages"); Aceros Prefabricados, S.A. v. TradeArbed, Inc., 282 F.3d 92, 98 (2d Cir. 2002) (explaining that a party's "failure to include the General Conditions of Sale with the confirmation orders [did] not prevent those terms from being included in its contract").

concluded that Plaintiffs' claim for breach of the implied warranty of merchantability fails for Cynosure's disclaiming such implied warranty in these contracts. "It is the availability of a remedy at law, not the viability of that remedy, that prohibits a claim for unjust enrichment." Shaulis v. Nordstrom, Inc., 865 F.3d 1, 16 (1st Cir. 2017) (affirming dismissal of claim for unjust enrichment where plaintiff and defendant had valid contract). In other words, because the SculpSure purchase agreements "plainly govern[] the relationship of the parties," Plaintiffs' claim for unjust enrichment is precluded. Reed v. Zipcar, Inc., 883 F. Supp. 2d 329, 334 (D. Mass. 2012), aff'd, 572 F. App'x 20, 21 (1st Cir. 2013); see Fernandes v. Havkin, 731 F. Supp. 2d 103, 114-15 (D. Mass. 2010) (granting summary judgment on unjust enrichment claim in light of a valid contract). The same is true as to the existence of Plaintiffs' Chapter 93A claim; even if it proved not to be viable here, "its 'mere availability' bars [their] claims for unjust enrichment." Reed, 883 F. Supp. 2d at 334 (dismissing unjust enrichment claim even as Chapter 93A claim is also dismissed).

Plaintiffs' reliance upon Lass v. Bank of Am., N.A., 695 F.3d 129, 140-41 (1st Cir. 2012), is unavailing because that case addressed the possibility for plaintiffs to maintain alternative theories of entitlement to legal and equitable remedies at the pleading stage and explicitly stated that "the district court [would] be in a better position once the record [was] more developed to determine whether the unjust enrichment claim should survive." Id. Their reliance upon Devona v. Zeitels, No. 13-cv-10952-IT, 2016 WL 4468553, at *1 n.1 (D. Mass. Aug. 23, 2016), is similarly unavailing because, unlike in Devona, where there was a genuine dispute of material fact as to the validity of the contract governing the parties' relationship, and here where, as a matter of law, the contracts between the parties were valid. Id. at *1 n.1. Accordingly, the Court grants summary judgment to Cynosure on Plaintiffs' claim for unjust enrichment.

## VI.     Conclusion

For the foregoing reasons, the Court DENIES Plaintiffs' motion for class certification, D. 60 (and D. 110 in No. 17-11435-DJC), and ALLOWS Cynosure's motion for summary judgment, D. 55.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge